**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**STEPHEN DALE FOWLER,**

     **Plaintiff,**

**v.**                                            **Case No.: 3:11-cv-0442**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

     **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. (ECF No. 1). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 2 and 4). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 8 and 10).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

### I.  Procedural History

Plaintiff, Stephen Dale Fowler (hereinafter "Claimant), previously applied for DIB benefits on September 27, 2006. (Tr. at 17). The application was denied initially

and again following reconsideration. (*Id.*). Subsequently, Claimant requested a hearing before an administrative law judge (hereinafter "ALJ"). After considering the evidence and testimony, the Honorable Roseanne Dummer, ALJ, denied Claimant's application by decision dated February 25, 2009. (*Id.*). The ALJ's decision became the final decision of the Commissioner on May 5, 2009 when the Appeals Council denied Claimant's request for review. (*Id.*).

In the instant case, Claimant filed an application for DIB benefits on May 13, 2009, alleging a disability onset date of January 3, 2005 due to seizures, short term memory problems, motor skill problems, and personality disorder. (Tr. at 159–62, 187–95). The Social Security Administration (hereinafter "SSA") denied the application initially on June 22, 2009 and again on reconsideration. (Tr. at 93–97, 101–03). Thereafter, Claimant requested a hearing before an ALJ, and the Honorable Charlie Paul Andrus presided over Claimant's hearing on August 24, 2010. (Tr. at 35–67). In his written decision dated September 17, 2010, the ALJ found that the denial of Claimant's first application was binding for the period from January 3, 2005 to February 25, 2009. (Tr. at 17). Accordingly, the ALJ amended the disability onset date in this action to February 26, 2009, one day after the prior decision. Examining the period between February 26, 2009 to September 17, 2010, the ALJ concluded that Claimant was not disabled and denied his application for benefits. (*Id.*). The ALJ's decision became the final decision of the Commissioner on May 13, 2011 when the Appeals Council refused Claimant's request for review. (Tr. at 1–6). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in

Support of Judgment on the Pleadings. (ECF Nos. 6–8, 10). Consequently, the matter is ripe for resolution.

## II.    Relevant Evidence

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute or provide a clearer understanding of Claimant's medical background.

### A.    Treatment Records

### 1.    Prior to Amended Disability Onset Date

On June 27, 1988, Claimant was seen by Dr. Ijaz Ahmad for a neurological examination. (Tr. at 410). Based on the results of the examination, Claimant was diagnosed with a seizure disorder. (*Id.*). On June 7, 2004, a MRI of Claimant's brain was taken at Tri-State MRI. (Tr. at 274). The MRI revealed mild bilateral atrophy of the inferior cerebellar hemisphere, benign neuroepithelial cysts, and no acute or focal abnormalities. (*Id.*).

On September 5, 2006, Claimant was seen by Dr. Ahmad for evaluation of his ongoing neurological issues. (Tr. at 421). Claimant admitted that he had stopped taking his seizure medication in June and reportedly had been having short term memory problems since that time. (*Id.*). According to his wife, Claimant forgot tasks that he was supposed to perform and was socially inappropriate at times. (*Id.*). Dr. Ahmad noted that Claimant had recently resumed taking his medication (Dilantin). His neurological examination was normal. (*Id.*).

On September 13, 2006, Dr. Ahmad performed an EEG to assess the status of Claimant's seizure disorder. (Tr. at 422). Dr. Ahmad noted significant slowing in

3

Claimant's right temporal region and an independent abnormality in the left temporal region. (*Id.*). In addition, the EEG revealed intermittent sharp transients, which Dr. Ahmad believed were signs of the onset of a seizure focus. (*Id.*). On September 27, 2006, Claimant returned for a follow-up appointment with Dr. Ahmad. (Tr. at 421). Dr. Ahmad observed that Claimant's memory had "markedly deteriorated." (*Id.*). Claimant's short term memory was "extremely poor," requiring him to write notes for himself as reminders. (*Id.*). Moreover, Claimant's behavior had deteriorated. (*Id.*). Dr. Ahmad described Claimant as having very little insight into his problems and providing "mostly childlike" answers to Dr. Ahmad's inquiries. (*Id.*). Claimant's wife explained that Claimant had again stopped taking his medication and ended up in a "vegetable state." (*Id.*). Dr. Ahmad opined that it would be helpful to conduct a neuropsychological evaluation in the future. He also stated that Claimant was currently unable to hold a job given his medical condition. (*Id.*).

On November 29, 2006, Claimant was again examined by Dr. Ahmad. (Tr. at 420). Claimant reported that he was taking his medication regularly and had no further seizures. (*Id.*). Dr. Ahmad recorded that Claimant was having difficulty with conversation and remembering or managing time schedules. (*Id.*). On February 28, 2007, Claimant returned for a follow-up appointment with Dr. Ahmad. (*Id.*). Dr. Ahmad confirmed that Claimant was still free of seizures and was taking his medication on a daily basis. (*Id.*). However, Dr. Ahmad observed that Claimant's short term memory loss remained significant and that Claimant's judgment was "not the best." (*Id.*).

On August 8, 2007, Claimant returned for a follow-up appointment with Dr. Ahmad. (Tr. at 419). Claimant remained seizure free. (*Id.*). Claimant's wife reiterated

4

that Claimant had difficulty with his memory, particularly recent recall and sequential memory and reported that he was seeing a psychologist. (*Id.*). On August 29, 2007, Dr. Ahmad noted that he started Claimant on Tegretol and hoped to taper Claimant's Dilantin dosage. (Tr. at 418). On October 31, 2007, Dr. Ahmad monitored Claimant's response to Tegretol, documenting that Claimant had suffered no seizures since his last appointment. (*Id.*). On November 20, 2007, Dr. Ahmad instructed Claimant's wife to begin discontinuing Claimant's use of Dilantin. (*Id.*). Dr. Ahmad reevaluated Claimant's medication regimen on December 12, 2007. (Tr. at 417). He explained that his plan was to reduce the Dilantin dosage, but warned that this medication change might result in some seizure activity. Dr. Ahmad observed that Claimant "looked somewhat brighter and was more communicative, the best I have seen for a while [sic]." (*Id.*).

On January 29, 2008, Claimant reported that he had suffered two seizures since his last appointment. (*Id.*). Dr. Ahmad informed Claimant that he might need to take another anticonvulsant if the seizures continued. (*Id.*). On March 26, 2008, Claimant returned for a follow-up appointment with Dr. Ahmad, who recorded that Claimant was taking Carbamazepine (Tegretol) and had not experienced any seizures since the last appointment. (Tr. at 416). Dr. Ahmad found Claimant to be more talkative than on previous visits, although he still had difficulty with sequential and recent memory. (*Id.*). Dr. Ahmad recommended that Claimant see a psychiatrist to determine if Claimant should be prescribed antidepressants. (*Id.*).

At a follow-up appointment on June 25, 2008, Dr. Ahmad noted that Claimant had experienced one generalized seizure in the prior three months. (*Id.*). He started Claimant on a second anticonvulsant, Keppra, warning that it could cause personality

changes and liver toxicity. (Tr. at 416). After completing a conventional neurological examination, Dr. Ahmad noted that Claimant continued to have difficulties with his cognitive function. (*Id.*). Claimant could not complete word puzzles and was often unable to remember people that he had known for decades. (*Id.*). Further, Dr. Ahmad stated that Claimant was "quite slow in thinking." (*Id.*). Although Claimant had undergone a psychological evaluation, Dr. Ahmad documented that he had never received a formal report. (*Id.*). Dr. Ahmad felt that Claimant likely had a cognitive disorder although his neurological examination was normal. (Tr. at 415).

On September 4, 2008, David E. Frederick, Ph.D, at Argus Psychological Services drafted a letter to Claimant's attorney summarizing Claimant's psychological diagnosis and treatment. (Tr. at 331). Dr. Frederick related that he had seen Claimant for psychotherapy on more than forty occasions during the period between December 6, 2006 and October 24, 2007. (*Id.*). Dr. Frederick believed that Claimant's initial motivation in seeking treatment was to address a SSI-related neuropsychological screening performed on November 15, 2006, which found that: Claimant had no neurobehavioral cognitive deficits; his memory recall from immediate to remote was within normal limits, and his concentration was within normal limits. (*Id.*). Claimant's wife did not feel the evaluation accurately assessed Claimant's difficulties and sought further evaluation. After discussing Claimant's symptoms with his wife and with Dr. Ahmad, Dr. Frederick determined that psychotherapy was warranted to discover whether Claimant's problems were due to depression, seizures, or the side effects of his medications. Ultimately, Dr. Frederick diagnosed Claimant with Depressive Disorder NOS, Borderline Intellectual Functioning, and Dependent Personality traits. (*Id.*).

Dr. Frederick identified numerous issues that he focused on in psychotherapy; however, halfway through Claimant's therapy, his wife reported that Claimant still did not take any initiative on his own behalf and continued to demonstrate little emotion. On the positive side, Claimant's wife noticed that Claimant's stuttering was less pronounced and he was more willing to spend time with his family. (*Id.*). Considering these statements, Dr. Frederick opined that with psychotherapy "[o]nly limited success was achieved." (Tr. at 331).

On October 23, 2008, Claimant returned for a follow-up appointment with Dr. Ahmad. (Tr. at 415). Claimant reported experiencing two generalized seizures since his last appointment. (*Id.*). Dr. Ahmad determined from laboratory measures of the medications in Claimant's blood that he had not been regularly taking his prescriptions. (*Id.*). Dr. Ahmad discussed with Claimant at length the importance of closely following his medication regimen; however, in response, Claimant adamantly denied noncompliance. (*Id.*). Dr. Ahmad recommended that Claimant's wife give Claimant his medication to ensure that he was maintaining therapeutic drug levels. (*Id.*). Dr. Ahmad again examined Claimant on January 21, 2009. (Tr. at 414). According to Dr. Ahmad, Claimant had remained seizure free since he began taking his medications regularly. (*Id.*).

### 2.    *Relevant Time Period*

On June 4, 2009, Dr. Frederick completed a treating source routine abstract form at the request of the West Virginia Disability Determination Section. (Tr. at 327–30). Dr. Frederick recorded the results of Claimant's last IQ test, which had been administered on November 15, 2006. The test reflected a verbal IQ score of 89, a performance IQ score of 80, and a full scale IQ score of 84. (Tr. at 327).  Next, Dr.

Frederick reported Claimant's mental status as of the time of his last appointment on October 24, 2007. (Tr. at 328). Dr. Frederick noted that Claimant's speech was normal and he did not experience delusions, hallucinations, suicidal ideation, or homicidal ideation. (*Id.*). In Dr. Frederick's opinion, Claimant's judgment was moderately deficient, his affect was restricted, and his mood was angry. (*Id.*). Dr. Frederick concluded that Claimant's perception was normal, his insight was moderately deficient, and his psychomotor activity was within normal limits. (*Id.*).

Dr. Frederick then completed a medical source statement related to Claimant's mental residual functional capacity. (Tr. at 329). Dr. Frederick found that Claimant's immediate memory, recent memory, concentration, task persistence, and pace were all within normal limits. (*Id.*). However, Dr. Frederick concluded that Claimant's social functioning was moderately deficient. (*Id.*). Dr. Frederick diagnosed Claimant with Depressive Disorder NOS, Borderline Intellectual Functioning, Dependent Personality traits, and seizures. (Tr. at 330).

On July 29, 2009, Claimant returned for a follow-up appointment with Dr. Ahmad. (Tr. at 413). Claimant complained of having a generalized seizure since his last visit, being very forgetful, and having problems with his memory. (*Id.*). Dr. Ahmad noted that Claimant's medication levels were once more sub-therapeutic and again recommended that Claimant's wife monitor his medication intake to insure Claimant's compliance with his treatment plan. (*Id.*). Dr. Ahmad also recommended that Claimant continue with psychological consultation.

On October 28, 2009, Dr. Ahmad completed a seizure residual functional capacity questionnaire at the request of the SSA. (Tr. at 406–08). He diagnosed Claimant with seizure disorder, noting that Claimant's seizures were generalized,

partial complex, and typically resulted in loss of consciousness. (*Id.*). According to Dr. Ahmad, the frequency of the seizures was variable and when Claimant experienced a seizure, it usually occurred without warning and lasted for two to three minutes, often causing urinary incontinence and occasionally resulting in physical injury to Claimant. (*Id.*). After a seizure, Claimant was usually confused and exhausted. Dr. Ahmad felt Claimant's seizures were often precipitated by exposure to stress. (*Id.*). He opined that the seizures likely interfered significantly with Claimant's daily activities. (*Id.*). Dr. Ahmad noted that Claimant failed to regularly take his medication, which affected the frequency of his seizures. (*Id.*). He also commented that Claimant complained of experiencing a lack of alertness due to his seizure medication, which would impair Claimant's ability to work. (Tr. at 408).

In Dr. Ahmad's opinion, in a work environment, Claimant's seizures were likely to disrupt the work of co-workers. He felt Claimant would require more supervision than an unimpaired worker. (*Id.*). Further, Dr. Ahmad concluded that Claimant could not work at heights, operate power machinery, or operate a motor vehicle. (*Id.*). Dr. Ahmad opined that Claimant was capable of independently using public transportation, but added that Claimant experienced depression, irritability, social isolation, poor self-esteem, short attention span, and memory problems in addition to seizures. (*Id.*). In regard to Claimant's ability to work an eight-hour day, Dr. Ahmad stated that Claimant would have to take unscheduled breaks every two to three hours. (Tr. at 409). Nonetheless, Dr. Ahmad found that Claimant was capable of working in a low stress job. (*Id.*). He anticipated that Claimant would experience "good days" and "bad days" and, on average, would likely miss more than four days of work per month.

(*Id.*). Dr. Ahmad emphasized that Claimant had poor communication skills, short-term memory loss, and poor judgment. (*Id.*).

Also on October 28, 2009, Dr. Ahmad examined Claimant. (Tr. at 412). Dr. Ahmad noted that Claimant remained seizure free, but still had a poor short-term memory and very poor communication skills. (*Id.*). Claimant returned for a follow-up appointment with Dr. Ahmad on February 24, 2010. (Tr. at 431). Dr. Ahmad reiterated that Claimant was seizure free. (*Id.*). Similarly, on June 23, 2010, Claimant reported no new seizures and his neurological examination was normal. (Tr. at 430). Again, on October 20, 2010, Dr. Ahmad recorded that Claimant remained free of seizures and his neurological examination was normal. (Tr. at 445).

**B.**    **Consultant Assessments**

**1.**    ***Physical Health Assessments***

On June 18, 2009, Cindy Osborne, DO, completed a Physical Residual Functional Capacity (RFC) Assessment. (Tr. at 332–39). Dr. Osborne found that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in his ability to push or pull. (Tr. at 333). Claimant's postural limitation restricted him to activities that never required climbing ladders, ropes, or scaffolds. (Tr. at 334). Dr. Osborne found that Claimant was not subject to any manipulative, visual, or communicative limitations. (Tr. at 335–36). Claimant's environmental limitations required him to avoid all exposure to hazards, such as machinery and heights. (Tr. at 336). In conclusion, Dr. Osborne found Claimant to be partially credible and opined that Claimant's RFC should be reduced to medium work with height and hazard limitations. (Tr. at 339).

On September 29, 2009, Rogelio Lim, MD, completed a second RFC assessment. (Tr. at 391–98). Dr. Lim found that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in his ability to push or pull. (Tr. at 392). Claimant's postural limitation restricted him to activities that never required climbing ladders, ropes, or scaffolds. (Tr. at 393). Dr. Lim found that Claimant was not subject to any manipulative, visual, or communicative limitations. (Tr. at 394–95). Claimant's environmental limitations required him to avoid all exposure to hazards, such as machinery and heights. (Tr. at 395).

Dr. Lim reviewed Claimant's activities of daily living. (Tr. at 398). Claimant reported taking care of his pets, performing self-care, preparing simple meals, cleaning the house, walking, shopping for groceries, reading, visiting with family, and going to doctor appointments, although he had difficulty talking and using his hands. (*Id.*). Dr. Lim concluded that Claimant was credible and that there were no problems with Claimant's neurological system. (*Id.*). According to Dr. Lim, Claimant was capable of performing medium work with environmental restrictions. (*Id.*).

### 2.   *Mental Health Assessments*

On June 18, 2009, G. David Allen, Ph.D, completed a Psychiatric Review Technique (PRT) at the request of the SSA. (Tr. at 345–58). Dr. Allen based his analysis on Listings 12.02 (Organic Mental Disorders) and 12.04 (Affective Disorders) as these were the most applicable to Claimant's diagnoses and symptoms. (Tr. at 345). Dr. Allen found that Claimant suffered from Borderline Intellectual Functioning and Depressive Disorder NOS. (Tr. at 346, 348). He then assessed Claimant's functional limitations under the paragraph "B" criteria of the Listings, determining that

11

Claimant's difficulties in maintaining social functioning, maintaining concentration, persistence, and pace were moderate in nature, his restriction of activities of daily living was mild, and he had not experienced extended episodes of decompensation. (Tr. at 355). Further, Dr. Allen confirmed that the evidence did not establish the presence of paragraph "C" criteria. (Tr. at 356).

Dr. Allen reviewed Claimant's most recent Adult Function Report, documenting that Claimant's activities of daily living included: personal care, reading the paper, doing crosswords, reading and listening to books on tape, and doing odd jobs around the house; and his reported hobbies included: playing the piano, watching movies, playing board games, and visiting family two to three times a month. (Tr. at 357). Claimant noted that he had difficulties with memory, concentration, understanding instructions, and getting along with others and reported difficulty coping with stress and change. (*Id.*). Dr. Allen found that Claimant was credible. (*Id.*).

Dr. Allen then completed a Mental Residual Functional Capacity Assessment. (Tr. at 341–44). First, Dr. Allen addressed Claimant's understanding and memory, finding: no evidence that Claimant's ability to remember locations and work-like procedures was limited; that Claimant's ability to understand and remember very short and simple instructions was not significantly limited; and that Claimant's ability to understand and remember detailed instructions was moderately limited. (Tr. at 341).

Next, Dr. Allen evaluated Claimant's functional limitations related to sustained concentration and persistence, finding that Claimant's abilities to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; and to work in coordination with or proximity to

others without being distracted by them were not significantly limited. (Tr. at 341–42). Further, Dr. Allen found that Claimant's abilities: to carry out detailed instructions; to maintain attention and concentration for extended periods; and ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were moderately limited. (Tr. at 341–42). Dr. Allen concluded that there was no evidence of limitations with respect to Claimant's ability to make simple work-related decisions. (Tr. at 341).

Third, Dr. Allen evaluated Claimant's functional limitations in terms of social interaction. (Tr. at 342). Dr. Allen found that Claimant's abilities to ask simple questions or request assistance, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness were not significantly limited. (*Id.*). Dr. Allen also found that Claimant's abilities: to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisor; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes were moderately limited. (*Id.*).

Finally, Dr. Allen considered Claimant's capacity to adapt to new circumstances. (*Id.*). Dr. Allen found that Claimant's abilities: to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others were not significantly limited. (*Id.*). Dr. Allen found that Claimant's ability to respond appropriately to changes in the work setting was moderately limited. (*Id.*). Dr. Allen concluded that Claimant's impairments did not meet Listing criteria. (Tr. at 343). In Dr. Allen's opinion, Claimant could perform substantial gainful activity in settings where social

13

demands were limited and the procedural complexity of the work involved no more than simple, repetitive actions. (*Id.*).

On August 19, 2009, Lisa Tate, MA, performed a psychological evaluation of Claimant at the request of the West Virginia Disability Determination Service. (Tr. at 370–76). Ms. Tate completed a clinical interview and mental status examination, then administered the Weschler Adult Intelligence Scale – Third Edition (WAIS III) evaluation and the Cognistat assessment tool. According to Ms. Tate's report, Claimant presented with a normal gait and normal posture. (Tr. at 370). His speech was good with normal rate and volume. (Tr. at 370–71). He advised that his wife drove him to the interview, stating that he was no longer able to drive because he frequently forgot where he was going and had a seizure disorder. (Tr. at 371). Claimant described struggling with memory problems for the previous 25 years and having difficulty with long-term memory, such as recognizing faces and remembering names of people with whom he had attended school. (*Id.*). He reported that these memory problems had increased with age. (*Id.*). Claimant also reported having difficulty with his attention span and ability to concentrate. (*Id.*). He related his work history as including a job as a cashier at a convenience store, one to two years prior. (Tr. at 372). However, Claimant stated that he was fired from that position because he was unable to perform his job duties. (*Id.*). He also previously worked as a collection agent and department manager of a hardware store. After obtaining this history, Ms. Tate reviewed the results of Claimant's previous IQ test. (*Id.*). She noted that Claimant's scores, which were all in the average range and considered valid, resulted in a diagnosis of Borderline Intellectual Functioning. (*Id.*).

Ms. Tate then completed a mental status examination. (*Id.*). Claimant's affect,

thought processes, thought content, perception, insight, judgment, memory, and psychomotor behavior were all found to be within normal limits although his concentration was mildly deficient. (*Id.*). Claimant reported no suicidal or homicidal ideation. (*Id.*). Ms. Tate administered the WAIS III and calculated the results. (Tr. at 372–73). Claimant scored an 84 on the verbal section, an 84 on the performance section, and had a full scale IQ score of 83. (Tr. at 373). Ms. Tate found the results to be valid. (*Id.*). According to Ms. Tate, Claimant was able to recall and understand directions during testing and his motor behavior was normal. (*Id.*). Ms. Tate found Claimant's work pace to be normal, and he was persistent in finishing the test. (*Id.*). Ms. Tate subsequently administered the Cognistat evaluation. (*Id.*). Claimant scored in the "average" range in all areas of the Cognistat assessment, including: attention, comprehension, repetition, naming, constructions, memory, calculations, similarities, and judgment. (*Id.*). Based on the testing results and her observations, Ms. Tate diagnosed Claimant with a seizure disorder by history. She made no other psychological diagnosis, but determined that Claimant's intellectual functioning was below average. (Tr. at 374). Ms. Tate noted that despite Claimant's reports of problems with his memory, attention, and concentration, his Cognistat scores were average. (*Id.*).

Ms. Tate also reviewed Claimant's activities of daily living. Claimant reported that he cared for the family's pets, cleaned the house, cooked, washed dishes, listened to music, read the newspaper, and took a walk around the cemetery. (*Id.*). Claimant stated that he went to the grocery store with his wife and to doctor's appointments on a regular basis. (*Id.*). He had no other hobbies or interests. (*Id.*). Ms. Tate found that Claimant's social functioning, concentration, persistence, and pace were all within

normal limits. (Tr. at 374). In conclusion, Ms. Tate opined that Claimant was competent to manage any benefits he might receive. (Tr. at 375).

On September 24, 2009, Jeff Harlow, Ph.D, completed a Psychiatric Review Technique based on the results of Ms. Tate's psychological evaluation. He noted that Ms. Tate found no current active mental diagnoses; thus, Dr. Harlow concluded that there were no medically determinable mental impairments. (Tr. at 377).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. (the "'Listing") *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's RFC, which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairment prevents the performance of past relevant work. *Id.* § 404.1520(f). If the impairment does prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868–69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). That section provides as follows:

17

c) *Rating the degree of functional limitation.*

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment, the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the

18

evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).

Next, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3). The regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(2).

In the present case, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2010. (Tr. at 19, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since February 26, 2009, the amended disability onset date. (Tr. at 20, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant's seizure disorder, borderline intellectual functioning, depressive disorder, and dependent personality disorder were

19

severe impairments. (*Id.*, Finding No. 3). Under the third inquiry, the ALJ ascertained that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments outlined in the Listing. (*Id.*, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had the residual functional capacity to perform work limited to the light exertional range. (Tr. at 22, Finding No. 5). Claimant could lift or carry 20 pounds occasionally and ten pounds frequently; could not climb ladders, ropes, or scaffolds; could not work at heights or around dangerous machinery; should avoid excessive dust and fumes; could not perform work requiring balancing; and was limited to simple routine jobs working in a small group with limited contact with the public. (*Id.*).

The ALJ analyzed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 27, Finding Nos. 6–10). The ALJ considered that (1) Claimant was unable to perform past relevant work; (2) he was born in 1958, and at age 51, was defined as an individual closely approaching advanced age (20 CFR 404.1563); (3) he had a high school education and could communicate in English; and (4) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was not disabled regardless of the transferability of job skills. (*Id.*). Based on the testimony of a vocational expert, the ALJ found that Claimant could make a successful adjustment to employment positions that existed in significant numbers in the national economy, such as a non-clerical office worker, file clerk, product inspector, product sorter, and production helper. (Tr. at 27–28). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 28, Finding No. 11).

20

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant contends that the Commissioner's decision is not supported by substantial evidence because: (1) the ALJ erred in finding that Claimant's seizure disorder did not satisfy Listing 11.02 or Listing 11.03; (2) the ALJ failed to properly consider Claimant's mental impairments in combination; (3) the ALJ's credibility finding was erroneous; (4) the ALJ's RFC assessment was erroneous; and (5) the ALJ erred in finding that the transferability of job skills was not material in Claimant's case.

## V.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must

affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775. Applying this legal framework, a careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

## VI.   <u>Analysis</u>

Having thoroughly considered the evidence and the arguments of counsel, the Court rejects Claimant's contentions and finds that the decision of the Commissioner is supported by substantial evidence.

### A.      Listings 11.02, 11.03

Claimant first challenges the ALJ's finding that Claimant's seizure disorder did not satisfy the criteria for Listing 11.02 and Listing 11.03. (ECF No. 8 at 6). According to Claimant, the ALJ failed to consider that Claimant's seizures occurred at all times of day and that these seizures significantly affected Claimant's ability to perform substantial gainful activity. Having considered the record and arguments, the Court concludes that the ALJ was correct in his determination that Claimant did not satisfy the criteria for Listing 11.02 or Listing 11.03.

To satisfy the criteria for Listing 11.02, Claimant must demonstrate that his seizure disorder caused convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. A seizure pattern satisfies the criteria for Listing 11.02 if it (1) includes daytime episodes (loss of consciousness and convulsive seizures) or (2) nocturnal episodes manifesting residuals which interfere significantly with activity during the day. In his written opinion, the ALJ concluded that Claimant's seizure

disorder did not satisfy Listings 11.02 because the medical record did not "document a typical seizure pattern of the severity of frequency described under these sections." (Tr. at 20).

The ALJ's conclusion that Claimant did not satisfy Listing 11.02 is supported by substantial evidence. The medical record indicates that Claimant was diagnosed with a seizure disorder as early as 1988. (Tr. at 410). Claimant was prescribed Dilantin, Keppra, and Tegretol to control his seizures. During the relevant time period, February 26, 2009 to September 17, 2010, there is no record of Claimant experiencing any seizures. (Tr. at 412, 413, 430, 431, 445). Likewise, none of Claimant's neurological examinations revealed abnormalities. (*Id.*). To the extent that Claimant reported experiencing seizures, the medical record indicates that these episodes occurred prior to the relevant time period and only after Claimant had stopped taking his anticonvulsant medication as prescribed. (Tr. at 415–17). Moreover, no medical source opined that Claimant satisfied the criteria for Listing 11.02.

Similarly, Claimant is unable to meet or equal the criteria of Listing 11.03.  To satisfy the criteria for Listing 11.03, Claimant must demonstrate that his seizure disorder caused nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. A seizure pattern satisfies the criteria for Listing 11.03 if it results in (1) an alteration of awareness or loss of consciousness and (2) transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

The ALJ's conclusion that Claimant did not satisfy Listing 11.03 is supported by

23

substantial evidence. As previously noted, there is simply no record of Claimant experiencing any seizures during the relevant time period. (Tr. at 412, 413, 430, 431, 445). All of Claimant's reports of seizures occurred in the time period prior to February 25, 2009. (Tr. at 415–17). Further, these seizures typically occurred after Claimant had discontinued taking his anticonvulsant medication and stopped when he was compliant with his medication regimen. Given the lack of evidence that Claimant's seizures occurred with the frequency and severity of seizure activity outlined in Listing 11.03, Claimant is unable to demonstrate that he met or equaled the Listing.

### B.    Impairments in Combination

Next, Claimant argues that ALJ erred by not finding that Claimant's combined impairments equaled the criteria in Listings 12.02, 12.04, and 12.08. (ECF No. 8 at 3–6, 8–11). Much of Claimant's argument is devoted to challenging the ALJ's factual findings. In Claimant's view, many of the ALJ's factual findings were erroneous and based on a misunderstanding of Claimant's mental impairments. Although Claimant argues that his impairments in combination satisfy Listings 12.02, 12.04, and 12.08, Claimant does not analyze the severity requirements of the Listings, nor explain how his impairments in combination were medically equivalent to the Listing's definition of disability.

#### *Medical Equivalence*

A determination of disability should be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. Because the Listing is

designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). "For a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Sullivan*, 493 U.S. at 530. If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 520; *see also* 20 C.F.R. § 404.1526. In Title 20 C.F.R. § 404.1526, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. *Id.* § 404.1526(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment. *Id.* § 404.1526(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be

proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* § 404.1526(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment . . . A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.

In the present case, the ALJ determined that Claimant had the following severe impairments: seizure disorder, Borderline Intellectual Functioning; Depressive Disorder (not otherwise specified); and Dependent Personality Disorder. (Tr. at 20). Given the nature of Claimant's severe impairments, the ALJ logically compared Claimant's medical findings to the criteria of the listed impairments contained in Section 12.00 (mental impairments). (Tr. at 20–22). The ALJ properly selected the various listed impairments within this section that most closely aligned with Claimant's impairments (12.02, 12.04, and 12.08) and thoroughly explained why Claimant's findings were not equivalent to the criteria of each selected impairment.

The ALJ focused his analysis on the Paragraph B criteria that was required to satisfy each of these Listings. First, the ALJ reviewed Claimant's activities of daily living, finding that Claimant had no more than mild restriction in this area. (Tr. at 21). In the ALJ's view, the evidence of record demonstrated that Claimant retained the ability to perform activities of daily living in "an independent and effective manner."

26

(*Id.*). Further, the ALJ noted that Claimant's seizures could be controlled by anticonvulsant medication and that Claimant was capable of engaging in his activities of daily living without special supervision because his seizures typically occurred at night. (*Id.*). Next, the ALJ addressed Claimant's social functioning, finding that Claimant had moderate limitations in this area. (*Id.*). Although Claimant reported being irritable and socially isolated, the ALJ found that Ms. Tate's mental status evaluation did not support a finding of marked limitation in social functioning. (*Id.*). Ms. Tate indicated that Claimant was cooperative and friendly throughout his evaluation and concluded that his social functioning was within normal limits. (*Id.*). Further, the ALJ observed no evidence to the contrary at the administrative hearing. (Tr. at 21).

The ALJ then turned to Claimant's concentration, persistence, and pace, finding that Claimant experienced moderate limitations in this area. (Tr. at 21–22). Claimant contended that he experienced his most significant difficulties in this area of functioning. (Tr. at 21). According to Claimant, he was very forgetful, unable to focus, and generally failed to finish tasks or projects that he started. (*Id.*). Considering Claimant's testimony, the ALJ agreed that Claimant would likely have some difficulty with complex or detailed matters, but concluded that the evidence as a whole did not support a finding of marked limitations. (*Id.*). Citing Ms. Tate's mental status examination, the ALJ noted that Claimant's memory, motor behavior, pace, and judgment were all found to be within normal limits. (Tr. at 21–22). Claimant's concentration was found to be only "mildly" deficient." (Tr. at 22). The ALJ reviewed Claimant's medical history and found no evidence that Claimant experienced any episodes of decompensation. (*Id.*). The ALJ also analyzed the evidence in a similar

fashion under the Paragraph C criteria and concluded that Claimant did not satisfy them. (*Id.*).

The ALJ's determination that Claimant's combined impairments did not equal Listings 12.02, 12.04, or 12.08 is supported by substantial evidence. Each of these Listings requires a claimant to satisfy the paragraph B or paragraph C criteria. In this case, Ms. Tate completed a psychological evaluation on August 19, 2009 and found that Claimant's affect, thought processes, thought content, perception, insight, judgment, memory, and psychomotor behavior were all within normal limits. (Tr. at 372). According to Ms. Tate, Claimant was able to recall and understand directions during testing and Claimant's motor behavior was normal. (Tr. at 373). Ms. Tate observed that he worked a normal pace and was persistent in finishing the test. (*Id.*). Despite his reports of problems with his memory, attention, and concentration, Claimant scored in the "average" range in all areas of the Cognistat assessment, including: attention, comprehension, repetition, naming, constructions, memory, calculations, similarities, and judgment. (*Id.*).

Ms. Tate subsequently reviewed Claimant's activities of daily living. Claimant reported that he cared for the family's pets, cleaned the house, cooked, washed dishes, listened to music, read the newspaper, and took a walk around the cemetery. (*Id.*). Claimant also stated that he went to the grocery store with his wife and to doctor's appointments on a regular basis. (*Id.*). In conclusion, Ms. Tate found that Claimant's social functioning, concentration, persistence, and pace were all within normal limits. (Tr. at 374).

Significantly, Ms. Tate's findings were wholly consistent with those of Dr. Frederick and Dr. Allen. (Tr. at 327–31, 341–58). In his June 4, 2009 routine abstract

form, Dr. Frederick found that Claimant's immediate memory, recent memory, concentration, task persistence, and pace were all within normal limits and his social functioning was moderately deficient. (Tr. at 327–31). Dr. Frederick did not find Claimant to be severely limited in any mental functional category.

Dr. Allen completed a mental RFC assessment and a PRT on June 18, 2009. (Tr. at 341–44, 345–58). He specifically analyzed Claimant's medical records under the paragraph B criteria and found that Claimant's difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace were, at most, moderate. (*Id.*). Claimant's restriction of activities of daily living was also moderate, and Claimant had experienced no episodes of decompensation. (*Id.*). Further, Dr. Allen found no evidence of paragraph "C" criteria. (Tr. at 356).

In summary, all of the consulting sources found that Claimant's mental impairments resulted in no more than mild to moderate functional limitations. Claimant's treating psychologist agreed with these conclusions. Neurological examinations and other objective testing all were within normal limits. Consequently, this body of evidence substantially supports the ALJ's decision. Claimant's criticisms of discrete findings of fact by the ALJ do not alter the Court's conclusion that the ALJ's decision is supported by substantial evidence. First, Claimant argues that the ALJ's finding that Claimant could perform personal care was erroneous because Claimant's wife performs those tasks for him. (ECF No. 8 at 3–4). Without citation to the record, Claimant asserts that his wife "does everything for him." (*Id.* at 3). This is contradicted by Claimant's own statements regarding his daily activities. Claimant reported that he had minimal problems with personal care except that his wife had to remind him what clothes looked good together. (Tr. at 196, 245). He confirmed that he was able to dress

and groom himself. (Tr. at 43). Claimant fails to explain how reliance on his wife's clothing choices rises to the level of a "marked" limitation for the purposes of the Paragraph B criteria.

Second, Claimant argues that the ALJ erred in finding that Claimant would be able to arrange for alternate transportation to and from his job. (ECF No. 8 at 4). To support his argument, Claimant relies on his own testimony. (*Id.*). At the administrative hearing, Claimant stated that he did not take any form of public transportation and "would not feel comfortable riding public transportation" to get to a place of employment. (Tr. at 52, 64). Although Claimant testified that he did not use public transportation, this does not mean that he is unable to use public transportation, as evidenced by the findings of his treating physician and Dr. Allen. On October 28, 2009, Dr. Ahmad completed a seizure residual functional capacity questionnaire and acknowledged that Claimant was capable of independently using public transportation. (Tr. at 406-088). Further, Dr. Allen concluded that Claimant's ability to travel in unfamiliar places or use public transportation was not significantly limited based on his mental RFC assessment. (Tr. at 342). The findings of Dr. Ahmad and Dr. Allen constitute substantial evidence on which the ALJ was entitled to rely; particularly, in light of his finding that Claimant was partially credible.

Finally, Claimant contends that the ALJ erred in finding that he took unmonitored walks on occasion. (ECF No. 8 at 4). Both Claimant and his wife testified that he often went for solitary walks around the cemetery near their house. (Tr. at 44–45, 58–59). However, Claimant's wife testified that she had to monitor Claimant during these walks because of concerns over his memory loss. (Tr. at 58–59). Contrary to the expressed concerns of Claimant's wife, the record includes ample support for the

conclusion that Claimant would be able to complete such a walk on his own—Dr. Frederick, Dr. Allen, and Ms. Tate all found that Claimant's memory was within normal limits. (Tr. at 329, 341, 372).

The ALJ properly found that Claimant's impairments in combination were not medically equivalent to Listings 12.02, 12.04, or 12.08. Records from Claimant's treating sources, state agency experts, and objective medical findings support the ALJ's determination, while Claimant's argument to the contrary relies predominantly on the testimony of Claimant and his wife. Therefore, the Court finds that the ALJ's decision was supported substantial evidence.

### *Functional Consequence of Claimant's Impairments in Combination*

Assuming that Claimant's contention is not that his impairments are medically equivalent to a listed impairment, but that the overall functional consequence of his combined impairments meets the statutory definition of disability, the analysis shifts from the Listing to the ALJ's RFC findings and the remaining steps of the sequential evaluation. As the Fourth Circuit Court of Appeals stated in *Walker v. Bowen,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." 889 F.2d 47, 50 (4th Cir. 1989). The Social Security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523.

Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985). The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Here, the ALJ took into account the exertional and non-exertional limitations that resulted from Claimant's medically determinable impairments in evaluating Claimant's RFC. The ALJ restricted Claimant to light work and provided numerous environmental and postural limitations, sensitive to Claimant's mental impairments and his functional limitations. (Tr. at 22). In assessing Claimant's residual functional capacity, the ALJ provided a thorough review of the objective medical evidence, the subjective statements of Claimant, and the opinion evidence. (Tr. at 23–27). At the outset, the ALJ explicitly stated that he considered all of Claimant's medically determinable impairments in combination. (Tr. at 22–23). The ALJ reviewed the Claimant's testimony and that of his wife regarding his daily activities and his mental and physical impairments. (Tr. at 23–24). The ALJ properly compared Claimant's testimony to the medical record, performing the two-step credibility analysis required by the Social Security regulations. (Tr. at 24–27). However, the ALJ concluded that Claimant's allegations of pain and functional limitations were exaggerated and that Claimant was not disabled.

Substantial evidence supports the ALJ's conclusion that Claimant was not disabled based on the functional consequences of his impairments in combination. As previously noted, the objective medical evidence and findings of state agency experts all support the conclusion that Claimant was capable of engaging in substantial gainful activity. No agency expert found that Claimant experienced marked limitations in any subcategory of the paragraph B criteria. No treating or consulting source found that Claimant satisfied the paragraph C criteria. Moreover, Claimant's treating neurologist frequently documented that Claimant's seizures were controlled by medication. The results of numerous neurological exams and other objective testing were all within normal limits. In light of the foregoing evidence, the Court concludes that the ALJ's decision was supported by substantial evidence.

## C.      Credibility Finding

Claimant contends that the ALJ's credibility assessment was faulty because he failed to give appropriate weight to Claimant's subjective complaints. Claimant argues that he consistently complained of and sought treatment for his seizure disorder over a period of decades, and these efforts support a credibility finding in his favor. In Claimant's view, his allegations and the medical record are "mutually supportive" of one another, further enhancing the strength of his claim. Contrary to Claimant's allegations, however, a review of the ALJ's written decision demonstrates that he fairly and fully weighed the evidence before him. The ALJ thoroughly examined the medical records, recorded observations, and testimony, explaining at length why he did not find Claimant's statements regarding the intensity, persistence, and severity of his symptoms to be fully credible. Further, substantial evidence existed in the record that

Claimant's subjective complaints did not correlate with his reported level of activity, his functional abilities, and the objective medical records.

Social Security Ruling 96-7p describes the two-step process by which an ALJ must evaluate symptoms, including pain, in order to determine their limiting effects on a claimant. First, the ALJ must analyze whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. SSR 96-7P. Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.*

Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ should consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. In performing this evaluation, the ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings;[1] any objective medical evidence of pain[2] (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions

---

[1] *See* 20 C.F.R. § 404.1529(c)(1).

[2] *See* 20 C.F.R. § 404.1529(c)(2).

of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions.[3] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996).

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court is not charged with simply replacing its own retrospective credibility assessment for that of the ALJ; rather, the Court must review the record as a whole and determine if it is sufficient to support the ALJ's conclusion. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976)).

Having reviewed the Transcript of Proceedings, including the ALJ's written decision, the undersigned finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security Rulings and is supported by substantial evidence. 20 C.F.R. § 404.1529; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). The ALJ carefully considered Claimant's subjective complaints *and* the objective medical record in reaching a conclusion regarding Claimant's credibility. Significant evidence existed in the record that Claimant's

---

[3] *See* 20 C.F.R. § 404.1529(c)(3).

complaints of symptoms did not correlate with the objective medical evidence or with his own descriptions of his daily activities.

At the outset of the two-step process, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to produce the symptoms described by him. (Tr. at 24). However, the ALJ deemed Claimant to be not fully credible in light of inconsistencies between Claimant's subjective complaints and the objective medical record. (*Id.*). The ALJ reviewed Claimant's and his wife's testimony regarding his seizure disorder, memory loss, motor skill problems, personality disorder, and difficulty with instructions and concentration. (Tr. at 23–24). Claimant testified that he was easily frustrated; was unable to cook anything more than a simple meal; experienced significant memory problems; was unable to remember instructions; could not pay bills or manage a bank account; could not drive; could only walk along a familiar path; and experienced severe headaches and seizures several times a month. (Tr. at 23). Claimant's wife reported that Claimant had violent grand mal seizures with residual effects lasting for up to 24 hours. (Tr. at 24). She further testified that Claimant had significant memory problems and that at times Claimant was simply unable to function due to lethargy. (*Id.*).

The ALJ compared Claimant's subjective complaints with the objective medical evidence, emphasizing that while Claimant alleged disabling symptoms, he received limited diagnostic testing and his medical care was generally conservative in nature. (Tr. at 24–27). In particular, the ALJ noted that Claimant's seizure activity was well-controlled by medication and break-through seizures occurred primarily during periods in which Claimant failed to comply with his treatment regimen. (Tr. at 25). Further, the ALJ noted that Claimant had not experienced significant worsening of his

36

symptoms since the Commissioner's prior determination that Claimant was not disabled. Claimant had not required any type of inpatient treatment and had not undergone any recent diagnostic testing. (*Id.*). Consequently, the ALJ gave great weight to the findings of state agency experts that found Claimant was capable of a reduced range of medium work activity. (*Id.*). Subsequently, the ALJ reviewed the Claimant's mental health record, observing that the record contained no evidence of further treatment during the relevant time period. (Tr. at 25–26). The ALJ reviewed the findings of the state agency experts, particularly focusing on the most recent findings of Ms. Tate, which indicated that Claimant's functional abilities were within normal limits with mild limitations in concentration. (Tr. at 26). Having reviewed the findings of Ms. Tate, the ALJ compared them to the testimony of Claimant's wife, noting that Claimant's wife was not a trained medical expert or an unbiased third party. (Tr. at 26–27). Based on an analysis of the record in its entirety, the ALJ concluded that Claimant was partially credible.

Substantial evidence supports the ALJ's credibility determination. Claimant's testimony was "inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the [symptoms] that the claimant alleges [he] suffers." *Hines*, 453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Despite Claimant's contention that he was unable to work, no state agency expert found that Claimant was unable to engage in substantial gainful activity. Furthermore, state agency experts found Claimant to be only partially credible because the medical evidence did not substantiate the degree of severity, persistence, and intensity alleged by him. An ALJ is entitled to afford significant weight to the opinion of a state agency non-examining psychologist or

physician: agency regulations specifically provide that state agency medical consultants "are highly qualified physicians ... who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i). Consequently, the ALJ reasonably found Claimant's credibility to be limited to the extent that Claimant's testimony was contradicted by the objective medical record, and his daily activities. *Hines*, 453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Therefore, the undersigned finds that the ALJ's discussion of Claimant's subjective complaints was sufficient and his conclusions were supported by substantial evidence.

### D.   RFC Assessment

Claimant asserts that the ALJ's RFC assessment was erroneous because Claimant is incapable of performing light or sedentary work. (ECF No. 8 at 13–15, 16–17). In support of his argument, Claimant cites medical records from outside the relevant time period, his own testimony, and the opinion of Dr. Ahmad. Having carefully reviewed the ALJ's RFC finding and the medical record, the Court rejects Claimant's contention. The ALJ appropriately addressed Claimant's functional limitations in determining his RFC, and the ALJ's conclusion that Claimant was capable of performing a reduced range of light work is supported by substantial evidence.

The Social Security regulations define light work as:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do

sedentary work, unless there are additional limiting factors such as loss
of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). SSR 83-10 provides further clarification of light work,

indicating that:

> Frequent means occurring from one-third to two-thirds of the time.
> Since frequent lifting or carrying requires being on one's feet up to two-
> thirds of a workday, the full range of light work requires standing or
> walking, off and on, for a total of approximately 6 hours of an 8-hour
> workday. Sitting may occur intermittently during the remaining time.
> The lifting requirement for the majority of light jobs can be accomplished
> with occasional, rather than frequent, stooping. Many unskilled light jobs
> are performed primarily in one location, with the ability to stand being
> more critical than the ability to walk. They require use of arms and hands
> to grasp and to hold and turn objects, and they generally do not require
> use of the fingers for fine activities to the extent required in much
> sedentary work.

"[I]n order for an individual to do a full range of work at a given exertional level

... the individual must be able to perform substantially all of the exertional and

nonexertional functions required in work at that level." SSR 83-10. If the claimant's

combined exertional and nonexertional impairments allow him to perform many of the

occupations classified at a particular exertional level, but not all of them, the

occupational base at that exertional level will be reduced to the extent that the

claimant's restrictions and limitations prevent him from doing the full range of work

contemplated by the exertional level.

In the instant case, the ALJ did not find Claimant capable of performing a full

range of light work. Instead, he determined that Claimant had the physical strength to

lift and carry 20 pounds occasionally and 10 pounds frequently, which meet the

lifting/carrying requirements of light work, but he then *reduced the range of light

work* that Claimant could perform in view of his additional nonexertional restrictions.

(Tr. at 22–27). The ALJ's RFC assessment was particularly sensitive to Claimant's

mental impairments, limiting Claimant to simple, routine jobs working in small groups without public contact. (Tr. at 22). The ALJ properly included all of these limitations and restrictions in his hypothetical questions to the vocational expert. (Tr. 61–63). With full attention given to Claimant's individualized RFC, the vocational expert found a significant number of jobs in the national and regional economy that Claimant could perform. (Tr. at 62–63). This testimony validated the ALJ's conclusion that occupations in the light exertional level were appropriate for Claimant despite his limitations and restrictions.

Claimant takes particular issue with the ALJ's rejection of a portion of Dr. Ahmad's written opinion. Dr. Ahmad postulated that, while at work, Claimant would require unscheduled breaks every few hours and would likely miss four days of work each month. The ALJ explained that he discounted this portion of Dr. Ahmad's opinion because it relied upon an assumption that Claimant would continue to have break-through seizures. The ALJ found the assumption to be faulty given undisputed evidence that as long as Claimant was compliant with his medication regimen, he remained seizure free. The ALJ emphasized that Claimant had never required intensive treatment or inpatient stabilization for his seizures; thus, indicating that his symptoms could be fully controlled with careful attention to his medication regimen.

In evaluating the opinions of medical sources, the Commissioner generally gives more weight to the opinion of a claimant's treating physician, who is often most able to provide "a detailed, longitudinal picture" of the claimant's alleged disability. *See* 20 C.F.R. § 404.1527(d) (2). Nevertheless, a treating physician's opinion is allotted **controlling weight** "only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other

substantial evidence." *Ward v. Chater,* 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also* 20 C.F.R. § 404.1527(d)(2). The opinion of a treating physician must be weighed against the record as a whole when determining its consistency with the evidence.  20 C.F.R. § 404.1527(d)(2).  Ultimately, it is the responsibility of the Commissioner, not the Court, to review the case, make findings of fact, and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court's role is limited to analyzing the record as a whole to determine whether the Commissioner's conclusions are rational.  *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1994).

Here, the medical record provides substantial evidentiary support for the ALJ's rejection of Dr. Ahmad's opinion on these points. During the relevant time period, Dr. Ahmad consistently found that Claimant's seizure disorder was controlled by diligent compliance with his treatment plan. In addition, the results of Claimant's neurological exams were all within normal limits, displaying no significant deterioration over the years. Two state agency experts completed physical RFC assessments of Claimant and found that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in his ability to push or pull. Three state agency experts and one treating psychologist evaluated Claimant's mental impairments and found that his mental functioning was within normal limits with only mild to moderate limitations. (Tr. at 327–30, 341–44, 345–58, 370–76, 377–90). No expert concluded that Claimant was unable to engage in substantial gainful activity. Accordingly, the Court finds that the ALJ's assessment of the weight to give Dr. Ahmad's opinion and the RFC finding is entirely consistent with the Social Security regulations and rulings and is supported by substantial evidence.

### E.    Transferability of Job Skills

Finally, Claimant argues that the ALJ erred when he found the transferability of job skills was not material to the disability determination. (ECF No. 8 at 15–16). In Claimant's view, his job skills decreased as his seizure disorder worsened and his memory deteriorated. Accordingly, the depreciation of his job skills should have been considered when evaluating the existence of employment positions suitable for him. Claimant's argument is somewhat curious in light of the ALJ's written opinion.

As a general rule, the transferability of job skills is most relevant to a disability determination when it is made by a strict application of the Medical-Vocational Guidelines contained in Appendix 2 to Subpart P of Part 404 ("Guidelines"), or when a claimant is of advanced or retirement age. In this case, the ALJ explicitly found that Claimant was unable to perform any past relevant work. (Tr. at 27). Consequently, the ALJ correctly referred to the Guidelines as a framework for reaching a disability determination. According to the Guidelines, Claimant's age, education, prior work experience, and capacity to perform light level exertional work mandated a finding that Claimant was "not disabled" regardless of whether or not his jobs skills were transferable. Thus, the ALJ correctly noted that the transferability of job skills was not material to his disability determination. The ALJ's analysis did not end there, however. In light of Claimant's particular mix of exertional and nonexertional limitations, the ALJ recognized that the Guidelines were not controlling on the disability determination. Consequently, the ALJ proceeded to examine the limitations unique to Claimant and obtained the opinion of a vocational expert before deciding whether jobs existed in the national economy that could be performed by Claimant. In the course of this analysis, the ALJ explicitly asked the vocational expert if Claimant had job skills

that could be transferred despite his physical and nonexertional limitations. (Tr. at 62). The vocational expert answered that question in the negative. Thus, when considering jobs suitable for Claimant, the ALJ essentially resolved the transferability issue in the manner most beneficial to Claimant. Moreover, the vocational expert presumed nontransferability when identifying jobs that Claimant was capable of performing. Accordingly, the Court finds that the ALJ performed the disability analysis in a manner entirely in accordance with the relevant Social Security regulations and case law.

**VII.   Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**: July 25, 2012.

Cheryl A. Eifert
United States Magistrate Judge